## Case No. 11,177.

### The PIONEER.

[1 Deady, 72.] [1]

District Court, D. Oregon. March 14, 1864.

SEAMEN'S WAGES — INLAND WATERS — DOUBTFUL CONTRACT — WAGE RATE — MISCONDUCT — PRIOR VOYAGE — CONTRACT PROHIBITED BY STATUTE.

1. Rule of ascertaining rate of wages of seaman, where the contract is doubtful, in case of an engineer on inland waters, commented on and applied.

2. Misconduct by seaman upon one voyage does not enure to the benefit of the owner so as to forfeit wages earned upon another; in this respect the case of monthly hirings, although continuous, upon river boats, likened to separate voyages at sea.

3. A party cannot recover upon a contract prohibited by statute, although the statute contain no express declaration that such contract shall

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

be void; therefore when libellant served as an engineer upon a steamboat from November 8, 1862, to July 13, 1863, without being licensed therefor by the United States inspectors, he could not recover wages for such service, because it was within the prohibition of section 9, subsec. 10, of the act of August 30, 1852 (10 Stat. 67).

[Cited in Harding v. Hagar, 63 Me. 517.]

4. Appropriation of payments—the rule stated and applied.

In admiralty.

E. W. McGraw, for libellant.

Amory Holbrook, for claimant.

DEADY, District Judge. Patrick J. Conlisk brings this suit to recover wages alleged to be due him for services as engineer on the steamboat Pioneer, for the fourteen months between November 8, 1863, and January 8, 1864. The libel was filed January 16, 1864, and alleges that there was no contract as to time of service or rate of wages, but that the current wages of such service during the period mentioned was $150 per month; and that the amount of the wages earned by libellant during this period of fourteen months is $2,100, upon which there has been payments to the amount of $602.75, leaving a balance of $1,497.25 due the libellant for which he prays a decree. The claimant, the Columbia River Transportation Co., a corporation of the territory of Washington, intervening for its interest as owner of the Pioneer, answered the libel on March 7, 1864. The answer admits the performance of the labor by the libellant as alleged, except for the five days between February 9 and 16, 1863. It denies that the hiring was without agreement as to the amount of wages, and alleges that libellant was first employed at his own solicitation, upon a representation or promise to the then owner, George Kellog, to work for less than $100 per month; that the master of the Pioneer afterwards promised to pay libellant $100 per month, but the current rate of engineers' wages, on such boats as the Pioneer, was not more than $75 per month; that the libellant was not qualified or authorized to act as engineer, not being duly licensed as such, and did not faithfully perform his duties as such, and that he was paid on account the sum of $680.82. Other defensive allegations in the answer were disposed of by the decree upon the exceptions thereto for impertinence. The Pioneer [Case No. 11,176]. A number of witnesses, including the libellant and the different owners from the commencement of the former's employment to the present, have been examined. With a few unimportant exceptions the witnesses appear to be interested, not only in the event of the suit, but in the controversy; and the statements of the libellant, and owners, are conflicting.

The first question is, to what rate of wages per month is the libellant entitled? There was no written agreement or shipping articles signed. Upon this fact counsel for libel-

lant makes the point that the case comes within the provision of the act of July 20, 1790 (1 Stat. 131), concerning the hiring of seamen, and that therefore the libellant is entitled to the highest wages paid engineers within the three months next preceding his employment. I think not. This act is confined by its terms to vessels bound to a foreign port, or of fifty or more tons burthen bound to a port in any other than an adjoining state. From the pleadings it appears that the Pioneer coasted between the ports of this state and such ports, and the ports of the territory of Washington. The libellant swears positively that there was no agreement as to the rate of wages which he was to receive, while the owner of the boat from November 8, 1862, to March 23, 1863, testifies that at the time of employing libellant, he told him that he had been paying $100 per month, and that the libellant replied he was willing to work for less. On March 23, 1863, the master, John T. Kerns, became the sole owner of the boat, and remained so until the sale to the claimant, the C. R. T. Co., of which he is a director. Kerns testifies, that at the time of purchasing the boat he made out libellant's account, crediting him with his wages at $100 per month, and presented it to him, and that the libellant made no objection to it. On the contrary the libellant swears that he did object to it and would not receive it, but the objection he made at the time, was not to the amount of the wages, but that the account was made out against the owner, and not the boat—saying that he did not understand that, and only knew the boat. The reason given for the objection to the account, shows pretty conclusively that it was not made to the rate of wages, but the security. Two witnesses, employed in inferior positions on the boat, testify to conversations with the libellant in which they state that he admitted that he was only getting $100 per month, but that he intended to claim or have $150 thereafter. An engineer testifies to a conversation between libellant and Kerns, in which the former demanded $150 per month, at that time, and in which there was something said about the wages for the time prior thereto, but he could not state particulars. The libellant and Kerns both testify concerning this conversation. The former says that he then demanded $150 per month, and that Kerns did not say whether he would give it or not, but said that libellant was trying to take advantage of the fact that the boat was in debt to him, and unable to pay. Kerns admits this demand for $150 per month, but says that he told libellant he could not pay it. Both these conversations with libellant evidently occurred near the same time; Kerns says the one with him occurred about December 1, 1863, but the other witnesses speak of October in the same year.

These are all the material circumstances bearing on the question of whether there was an agreement as to the rate of wages or not.

According to the authorities, where there is a doubt as to the rate of wages due a seaman, it should be resolved in his favor. In general this is a wise and just rule, founded upon correct observation of the relations between seamen and their employers. The latter can always protect themselves by having shipping articles signed, or in the case of steamboats on short routes by payments or settlements at short intervals. But I think the rule ought to be applied in this case with some reference to the circumstances. From these it appears that, in the fall of 1862, George Kellog, a doctor and landsman, was the owner of a small steamboat called the Pioneer. She was propelled by a single engine, and her machinery was cheap and rickety. Her master—Kerns—was practically a landsman. The boat had no established trade or route, but was knocking around on the waters of the lower Columbia and Wallamet rivers, amid a strong force of first-class boats, doing a sort of peddling, desultory, sporadic business. At times, Kerns was acting as master, clerk, "and all hands"—trying to make the boat pay her way. Under these circumstances, the libellant, an old engineer from the lakes, came to this country seeking employment, and at his own solicitation was employed upon the boat as engineer. Knowledge and experience were on his side, and under the circumstances he was as likely to take care of himself in a bargain as any of his employers. Of course the law rates the libellant as a seaman, and he is therefore entitled to the rights of a seaman, particularly in having a lien upon the boat for the wages due him; but in the matter of a bargain with the master or owners of the Pioneer, I think these circumstances show that the parties in fact dealt on about equal terms, and that therefore the rule spoken of should be applied in moderation and with caution. The evidence shows that first-class engineers have been receiving from $125 to $150 per month, but these are principally employed on good paying boats. Others appear to make the best bargain they can, depending somewhat upon the size of the boat and its business. Before the libellant went upon the Pioneer, her engineer was getting $100 per month.

From the premises, I find that the libellant was employed without any express contract as to the rate of wages, but being a stranger and desirous of employment and an opportunity to become acquainted with the rivers and business, he was more anxious to obtain a situation than to obtain the highest wages; that the sum of $100 a month was talked about at the time of the hiring, and subsequently acted upon by the libellant and the master and owners, and that under all the circumstances the law implies a hiring at that rate; that sometime in the fall, or December of 1863, the boat being unable to pay expenses, and being indebted to libellant, he demanded wages at the rate of $150 per month, and Kerns remonstrated against this

demand, telling him that the boat was unable to pay more. The libellant may have thought, as men in such circumstances sometimes do, that as the boat was unable to pay him what was due him, he would take advantage of his power as a creditor to fix the rate of his wages. Be this as it may, Kerns, without admitting or promising anything, put him off the best way he could, hoping to make some disposition of the boat, so as to put her affairs and prospects in a better plight. The demand for higher wages would not constitute a contract and make the boat liable therefor, unless with the assent of Kerns. Considering that the boat was embarrassed, and that the libellant had a large claim against her, I do not think such assent ought lightly to be implied. It was not expressly given, nor do I think there is reason to imply it. The reply of Kerns that the boat was not able to pay the higher wages, was a qualified refusal of the demand. At that time the boat was in port, unemployed half her time, and it seems to me that the libellant was taking the advantage of his claim for past services, to try and compel her owner to raise his wages. If the libellant was not satisfied to work for $100 per month, he might have gone elsewhere. What was due him he could have collected off the boat. I also find that the libellant is entitled to the wages of $100 per month from November 8, 1863, to January 8, 1864, and that he has been paid on account in one way and another, the sum of $671.62, leaving a balance of account in his favor of $728.30.

In coming to this conclusion I have considered the libellant as in the employ of the boat during the five days in February, when the answer alleges he was discharged. It is a small matter. The alleged discharge seems to have been a kind of conditional one, depending somewhat upon the boat's necessities and opportunities to get business. The crew were nominally discharged, but they were to continue to run the boat if they could pick up any jobs. But, of course, I admit that the libellant might have been discharged at that time, without the payment of the wages due. Certainly the libellant could not fasten himself upon this boat against the wishes of her owner, until his accruing wages eat her up, simply because the owner did not, or could not, pay him off. The boat was good for the wages already earned. I have also considered the libellant as entitled to wages until January 8, 1864, although he was actually discharged on January 5. The hiring must be construed to have been monthly, (The Pioneer [Case No. 11,176]), and as the discharge took place three days before the expiration of the month for no reason other than the pleasure or necessities of the owner, the libellant was entitled to his wages for the whole month.

Next, the claimant seeks to diminish whatever sum may be found due the libellant as wages by proof of misconduct on the part of the latter. But the most of the proof in support of this allegation suggests that the claimant, in making it, was trying to keep even with the libellant's charge of $150 per month. The machinery was shown to have been out of order a good deal, but I think this is more likely to have been the fault of the machinery itself, than the libellant. The boat was poor, earning little or nothing much of the time, and the libellant had to make repairs as best he could. As to the disobedience concerning the belt and sawing wood, it was but a single act near the end of his employment. Taylor, who was master at the time, was a landsman and new hand at the wheel, and seems to me to have provoked the engineer by trying to make himself particularly offensive concerning the sawing of this wood. The evidence concerning the working the engines when the boat was at the shore, but not made fast, is the only other proof of misconduct. I am inclined to think the engineer was simply mistaken as to the line being out, and was working the engines to keep steam down. There is also some evidence that the libellant at times was cross and ugly, and had difficulty with the men. With Kerns he seems to have got along pretty well. It is probable that the libellant is not a very agreeable man, and being in charge of poor machinery, often getting out of order, working with a lot of green landsmen trying to run an unlucky boat, it is not remarkable that his temper should sometimes get the better of him. An engineer should be not only obedient, but respectful to the master; but misconduct to forfeit wages should be satisfactorily proven and be of serious import. Again, a sufficient answer to all these charges of misconduct is found in the fact, that the libellant was continued in his employment and position as engineer. The boat was in port every day, and there was no legal or physical necessity for continuing to employ him. By continuing to employ him month after month, the presumption is, that his misconduct, if any, was overlooked and forgiven, and so Kerns says, "I overlooked it." The hiring being monthly, I think each month's service must be considered as a separate voyage at sea. Misconduct during one voyage cannot be made to work a forfeiture of wages earned during another. Piehl v. Balchen [Case No. 11,137]. The owners of a steamboat ordinarily have the power to protect themselves from misconduct of any of the crew, by discharging a man whose conduct is not satisfactory. This doctrine of forfeiture or diminution of wages is particularly applicable to voyages at sea, where it is often impossible to discharge a disobedient or negligent seaman, for months together. I do not think that any such misconduct is proven as entitles the claimant to a diminution of wages, or that

it is a case for diminution of wages, except for some misconduct occurring during the last month of the libellant's employment.

One other question remains to be disposed of. It is alleged in the answer, that the libellant was not authorized to serve as engineer for want of a license. The evidence is, that he was duly licensed by the supervising inspector for the district, on July 13, 1863, and that between November 8, 1862, and the last mentioned date he was not licensed, and that he had been a licensed engineer on the lakes between the years 1857 and 1860. The act of August 30, 1852 (10 Stat. 67), declares that: "It shall be unlawful for any person to employ or any person to serve as engineer or pilot on any such vessel, who is not licensed by the inspectors, and any one so offending shall forfeit $100 for each offense." Upon this provision it is maintained by the claimant that the libellant cannot recover wages for the period he was not licensed. I think such is the effect of the act beyond a question. When a statute makes a certain thing or act unlawful, no contract to do or perform such thing or act is valid, or can be enforced. In Bartlett v. Vinor, cited in Chit. Cont. 599, Holt, C. J., said: "Every contract made for or about any matter or thing which is prohibited and made unlawful by any statute, is a void contract, though the statute itself doth not mention that it shall be so, but only inflicts a penalty on the defaulter, because a penalty implies a prohibition, though there are no prohibitory words in the statute." See note 1, Chit. Cont. 599, where the American authorities are cited to the same effect. It would make prohibitory statutes nugatory and of no effect, if parties could act and contract in violation of them, and thus require the courts to enforce and uphold such contracts and doings. The law leaves the parties to such contracts where it finds them. It follows that the libellant is not entitled to recover wages for the period in which he served as engineer without a license, and in violation of the act.

This conclusion makes it necessary to ascertain and determine upon what part of the service, the lawful or unlawful, the payments made to the libellant shall be appropriated. Treating the wages earned during these two periods, or even the wages of each separate month, as distinct debts, the law gives the debtor the right to appropriate the payment to either or any of the debts, but he must do so at the time of payment, and by some act, word, or other means, to the knowledge of the creditor. Such an appropriation may be implied from circumstances as a previous refusal on the part of the debtor to pay one of two debts. Taylor v. Sandiford, 7 Wheat. [20 U. S.] 20. But if the debtor makes no appropriation of the payment, then the right attaches to the creditor in the same manner, except that it appears he may make the appropriation at any time thereafter before an action or controversy concerning the same. After this, the authorities differ as to the creditor's right to appropriate, but the weight of them seems to be that he may. Chit. Cont. 645, note 1. If neither the debtor or creditor has appropriated the payment, the court must apply it as appears to be the most equitable and just, other things being equal, giving the preference to the claims with the poorest security. Id. As between a lawful and unlawful contract, the law will appropriate a general payment to the former in preference to the latter, but it seems that the creditor may appropriate such payment upon the unlawful contract, or upon a debt barred by the statute of limitations. Chit. Cont. 646–648.

Appropriating these payments upon these rules and principles, or rather determining what appropriation, if any, was made of them by the parties, there is no doubt that all of the payments made before the lawful hiring commenced, were made and received on account of the wages earned upon the unlawful contract. There was then no other debt to apply them on. There does not appear to have been any express appropriation by either party, but bearing in mind that the parties regarded the wages for each month as equally due the libellant, I think it reasonable to infer that all the payments were made and received on account of the older debts. This conclusion is the more reasonable in this case, because as between the parties, the indebtedness does not present that well defined instance of distinct debts to which the doctrine of appropriation applies. More correctly speaking, this is the case of a running account, or a continuous series of separate accounts, treated by the parties as an entirety. In such cases, the doctrine of appropriation does not apply, and general payments are presumed to have been made in discharge of the earlier items of the account. Chit. Cont. 649, note 2; U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 737.

The libellant is entitled to recover his wages at the rate of $100 per month from the date of the lawful hiring—July 13, 1863—until January 8, 1864, a period of six months less five days, amounting to $583.33⅓. The wages for the eight months and five days during which the libellant was employed without license, cannot be recovered, but the payments are presumed to have been made on that account. This leaves the sum of $145.04⅔ of the libellant's account unpaid, and for which he cannot recover. Decree, that the libellant recover the sum of $583.33⅓, with costs.

PIONEER, The   See Case No. 6,451.